Let's make sure everybody, are you ready, Counselor Ridd? Okay. Thank you, Your Honors. The issues in this case are related to claim construction and I think it's apparent that the district court violated basic canons of claim construction. I'd like to hit the words transmit and message playback device. The ordinary meaning of transmit, Your Honors, is send. Why don't you start with when the caller is placed on hold. Okay. And this is the same issue, this same issue exists in the prior case, Muzak, that we just  And if we affirm on claim construction in Muzak, what does that do to this particular case? Well, AMTC argued to the judge that we want the judge to accept that definition of when a caller is placed on hold for the Muzak case. The judge agreed to do that and based on the judge doing that, it resulted in a non-infringement finding for AMTC. So that's why we asked to reverse that claim construction and to remand back based on the non-infringement finding. This is the same patent and this is the same term, when a caller is placed on hold. There's an issue on waiver here, whether waiver applies or not, that's to be decided. But if we affirm in Muzak on when the caller is placed on hold, doesn't that end the entire case? I don't believe so, Your Honor, and we addressed that in our brief. Again, in the Apple v. Motorola case, the same thing happened where the claim construction was changed and the court said we need to remand back to the lower court to do a damages analysis based on the full scope of the claims. No, we're not changing claim construction. Let's say that we affirm the district court's finding on construction on when the caller is placed on hold. In this case, Your Honor? No, in the Muzak case. In the Muzak case, it wouldn't be over. And that applies in this case, wouldn't it? Yes. Yes. You agreed to be bound by the interpretation? Yes. I believe that the terms would be the same for both cases, sure. The terms would be the same? The definition. Okay. The construction. The construction, yes. So then, does the on hold limitation itself require a judgment of non-infringement, or would one have to get to the other claim construction issues? We would have to get to the other ones because when a caller is on hold, it's only found in certain claims. So if that claim construction is affirmed, there's still other claims left in the case. So we do have to reach both issues? Yes, Your Honor. Okay. So when a caller is placed on hold definition, Your Honor, it's impossible for that definition because it excludes every single embodiment in the patent. There's no embodiment that works according to the district court's claim definition. Just for a little bit of background, really quick, the technology involves message playback  These are found at, for example, CVS. When you go into CVS, you walk around, you hear these announcements and messages and songs. Also, when somebody calls into the CVS and somebody doesn't answer, the caller is placed on hold. The message playback device will play messages and advertisements to the caller placed on hold. So the issue is, what does when mean? Does it mean at the very moment, or does it mean? I thought that the formulations of the choice here were not, to my mind, terribly clarifying. Obviously, playing something cannot occur at an instant because the playing takes time. So it's not at a moment. You can't have a durational event occur at a moment. The question, just tell me if this is right, it is whether when the caller starts listening to whatever is being played back, what is being heard necessarily starts at the beginning of that song, that so-called message, or whether it is enough for the message to be in process when the caller comes up. That's right, Your Honor. So it would be like broadcast or cable television channels. Everybody in the world who tunes into that channel at that moment hears the same word, the same note, and it doesn't restart in a caller-specific way. That's right, Your Honor. And that's what MUSEC and AMTC argued. They argued that when a caller is placed on hold, the message playback starts at that time. So they hear the message from the beginning, the song from the beginning. They're not put into a message in the middle of the message that was already played. And your point is the claim language doesn't require that, and in fact, the system doesn't even teach a message for that to occur because there's no upstream signal from the telephone system to the playback machine saying, will you please start at track A at the beginning. Exactly. There's no discussion at all. The patent embodiments, none of them work that way. None of the embodiments know the message playback is oblivious to when the caller is placed on hold. If the message playback device is oblivious to when the caller is placed on hold, it can't start the message playback at the moment a caller is placed on hold. And the reason, the whole rationale behind the district courts reading this into the characterized the file history. The file history was mischaracterized by Muzak. Muzak said they disclaimed systems where callers are placed in the middle of a song. That was never stated. They get that because they criticized continuous loop tape systems. Right. You say that that criticism was about cassette tapes, not about continuous loop. Can I put that aside? Can I address the bit in the re-examination where there were some remarks made about claims 32 and 34? Is this page 472 and 3 or something of the appendix? Your Honor, I'm sorry. I'm not exactly sure I remember that part. I think that we briefed it. Well, you made a fair number of amendments, language amendments in re-examination. As far as I can tell, there was no focus on the question of the message being played from the beginning or not. And the amendments all had to do with limiting it to a music on hold system. But there was one set of remarks about claims 32 and 34, which used some language about signals generated at the moment of being placed on hold or something like that. I think maybe those claim terms, all I know, Your Honor, is that those claim terms and amendments, there was never anything said or argued about at the moment. Those words or anything like that were never used. The applicant never said, we're making these amendments because we want the patent to cover systems where the song is played from the beginning. Nothing like that. There was no statements like that at all. And again, it reads out every single embodiment. And what's telling, Your Honor, is that the district court never cited one line or one site to the specification of that patent in support of the definition. And if they would have done that, they would understand that it excludes all embodiments. It's impossible to have that construction. The only claim construction filing made by Info Hold was made three days after a court order deadline. Isn't that right? I'm not sure about the timing on that. I think that it may have been, I wasn't in the case at that point, so I can't really speak to that. Can you speak to why counsel didn't even bother to show up at a court-ordered hearing? I believe that there were some health issues there. I don't really know. I think that's part of the record, Your Honor, that he had some health issues. But I don't know if it was part of that. You should know your record, counsel. That's important stuff. Right. But what's important? And it is important, Your Honor. Because it goes directly to waiver. I believe the court, though, did accept the briefing and accepted the arguments, Your Honor, and accepted whatever excuse that counsel made at that point for missing that. If I can move to transmit and message playback device, if you guys, I'm sorry, if Your Honors don't have any more questions about that, I apologize. The transmit and message playback device, again, the word transmit means send or communicate. The court, instead of taking the ordinary meaning of send or communicate for transmit, read in this step that happens before transmission, which device is initiating the contact with the other device before transmission. Clearly, reading in a limitation without any support, there was no discussion whatsoever in the intrinsic history and the patent and the file history about which device initiates the contact. It was never discussed. And the only rationale, apparently, with this court taking, again, AMT's argument that the receiving device initiating contact wasn't enabled, yet the law is clear that you don't need to enable something that's not claimed. And the word, and they admit that transmit is not, the definition taken was not the ordinary meaning, and yet there's no special definition. There's no clear disavowed claim scope. There's no clear intention from departing from that ordinary meaning at all in the record. Thank you, Your Honor. Mr. Pereira? I'd like to begin with a point that the standard of review proposed in the appellant's brief requires either correction or clarification. You will recall that at the trial stage, the district court issued a claims construction order that was apparently deemed unfavorable by the plaintiff, and they sought and were granted a stipulated judgment of non-infringement, which we obviously agreed to. However, the plaintiff turned appellant now in its opening brief appears to be arguing that the standard of review for the appeal should be the standard for summary judgment, even though there never was a summary judgment. And so they're saying that the standard should be de novo, which is fine insofar as it goes, but with non-moving party evidence and justified inferences drawn in its favor. So the record is clear. There was no summary judgment. This is simply a claim construction. The proper standard of review is de novo, with no unresolved factual inferences in the plaintiff's favor. Turning now to the district court properly construed the term when a caller is placed on hold, as seen in the 374 patent re-exam certificate, this term first appeared in the patent, and the appellant added it during the re-examination phase. And the primary dispute now, as Judge Toronto noted, is whether the phrase indicates that it takes place during a time the caller is on hold, as proposed by the appellant, or whether the playback for the caller begins when he is placed on hold. Of course. I'm just going to repeat that. The language used to describe the difference here seems to me, and maybe it's just me, to obscure what is at issue. Of course the thing is played back during the time the person is on hold. It's an event that occurs over a number of seconds or minutes, depending on how long you're waiting, not at an instant. And to say that the playback occurs, the question is when does the message begin? The playback begins at the point the caller is placed on hold. This is why I just misspoke, because what I just said obscures it too. Must the playback be at the beginning of the song? Let's just call it a song, the message is confusing. At the beginning of the song, when the caller first hears a sound. No, it need not be. Isn't that their position? No, there isn't a continuous loop that's playing. You either are or you are not on hold, and the point at which you are on hold is the point at which you are placed there. It is not a matter of temporal duration. It's self-evident that the person is not hearing anything until placed on hold. So that can't be the dispute. The dispute is whether what they're hearing is the first note of the song or whatever note happens to be on the playback machine at that time. Or concurrently, the first word of the message, or the middle of the message. Yes. I mean obviously it's more effective if when the caller is placed on hold, let's say it's a targeted advertising message and it's a gymnasium and you want to advertise your first 90-day discounted rate, obviously it's much more effective if it begins at that point. And the reason that this works better is when the caller is placed on hold, the message begins at that point. It might be more effective, but it requires a different technology in the sense that the machine doing the playback has to be told when caller number 17,312 has begun and start the song anew or the message anew. And there's not a word in this specification that suggests that that communication goes up to the playback machine, is there? Yes, that's exactly how the system works. In fact, it's pre-programmed from the computer and server side. Where is there that says when caller number 17,000 gets placed on hold, the playback device is made aware of that and starts the song anew. I don't know that it says it exactly like that, sir. What it does say, let's say for example in claims 7 and 13, it talks about exactly how the message is put into the queue. It's done in advance. It's done on the server and the computer side. And if you look at the commands that it obeys, it's things like what date and what time and there will be different target audiences for this. And so a message is placed in the queue so that when the person is placed on hold, then at that moment, they pick up and I'm sorry, at that moment, the message begins to play and they hear the entirety of the message. What you mean by the message begins to play? Yes. Of course the caller isn't hearing anything until the line is open to the playback machine. The question is what notes are being played there? Is it a caller specific note that is the first note always for each of the 17,000 callers who are coming on, started each time or is it like a channel on a television station? Everybody who signs on at 1003.37 is seeing exactly the same thing, whether it's the 17th note or the 47th note of the message. I think the nature of the pre-programming would be such that from the computer and server side, you would pre-program the tracks so that the targeting marketing was advantageous by site. The signal, the control signal... By site but not by specific caller? Well, it certainly could be. And for example, different sites, for example, would have... I think your position is that it's required to be. Yes. And this is consistent... Well, and this is... I am arguing that the district court properly construed the term when a caller is placed on hold and they did and it comes over because this comes from the Muzak case and it was brought over and was not opposed. It was put into the record pretty much without opposition. There were no new arguments. There was no request for reconsideration. There was no anything. It was adopted in total. And so they had all of these arguments to make over in the Muzak case. I am saying as to our case, this is the claim construction to which they agreed to and the And it will vary by location and time depending on who the likely target may be. Recognize that the gyms at different times, for example, may have soccer moms or yuppies working out after work and they will have different tracks that would be desirable. This is all programmed from this side. There was no disclosure whatsoever of the playback device side ever seeking a message or pulling something like that. It's all done on a prepanned basis. And so when you're put on hold, you get either the type of music that the person thinks that the programmer thinks would be appropriate or the sales message from the beginning. I think this is a significant waiver issue in this case to be honest with you. And maybe this is a little bit of the consternation for opposing counsel on this point because it did come over from the Muzak case and they had an opportunity over there to vigorously argue it. They requested reconsideration. The only thing that took place here was the district judge said that he did not anticipate revisiting already construed terms, but that didn't mean that he wouldn't and it doesn't mean that he couldn't. And opposing counsel, or appellant rather, was certainly entitled to go seek new law and bind the record for new facts. I'm kind of wondering why we're talking about waiver here for this simple reason. We have this issue in the Muzak case. We're going to decide it there. Everybody agrees whatever we decide there is going to be binding in this case. So I don't see what role there is for waiver. Well, there's waiver as to our case. We didn't personally participate in the Muzak case. This came over to us and was simply never argued. They didn't waive the right to have the benefit of a victory on the on-hold issue if they achieved that victory in the Muzak case. And we have the issue in that case. So why are we talking about waiver? Well, we're talking about waiver because, again, it was brought over. We took the same risk as they did. We didn't know what that was going to be. And the construction came over and we both accepted it for what it was. And in our case, again, they had. Sure, but you'd agree that if we say it's wrong in that case, it's wrong in this case. I would. Well, what about the transmit? I mean, what is it in, and their argument is, I think, as simple as this. The claims talk about the data being transmitted. They don't speak to what happens before that, like which of the two ends of the communication line sets up the line for the transmission. Yes. Okay. I think the, I guess to the extent there may be any ambiguity at all, it's the fact that the trial court simply added in a clarification with recognition that the programming always began on the computer and server side. So, succinctly stated, what we have is a remote programmable system where you have the programming computer and the server on one side. The server is configured to generate and transmit control signals over to the playback device. The playback device is programmed, is capable of receiving, and there is no opportunity for it to transmit. It has no transmission. It has no means to do so. There are. I'm sorry. I thought that there was something in, sorry, I have to keep going back and forth because these cases divide the issue, but column 19, lines 55 to 59, says the message playback devices are programmed to send a command complete response to the server to indicate when the last received command was successfully completed. That's the response signal. So that is not initiating contact. That's the response signal. Right. So that doesn't describe initiating the contact, but it does describe an upstream signal sending capability. It does. Okay. But, for example, in column 19, lines 10 to 16, it also says that when the playback device receives a packet of information, it's checked for errors. If it contains errors or is incomplete, it simply ignores it. It does not inquire. It does not try to get something new. It doesn't go pull anything. It doesn't do anything. It's only the fact that the server and the computer have initiated a signal. It has been almost like a handshake. Does the specification ever say that the server initiates the opening of the communication line? It only says that the server always delivers the control signal over to the playback device, and the initiation, therefore, could be the leading edge of the control signal packet. It could be a discrete packet, but you can't transmit from a computer and a server to a remote device without somehow initiating and getting communication, a handshake of some kind between the two devices. Right. Nowhere does it say that either side initiates. No. Not expressly. But what there is is… Doesn't that just mean that the question of initiation is not part of what this patent is about? Not to me, Your Honor, because I count 18 different instances throughout the patent and across the global universe of all the possible embodiments, and in every single one of them, the control signals that are programmed on the computer and server side are then generated and transmitted as control signals over to the playback device. There's not a single instance where the playback device ever initiates anything. There's no structure that would support it, even if it did. All it can do, to me, the claims are perfectly clear in the sense that what happens in every single disclosed embodiment without fail, and of those 18, we have two references in the summary of the invention, two in the abstract, four detailed descriptions. In every single one of them, it is the server and the computer which create and generate and transmit the control signals to the playback devices. Is that the same as or different from initiating the contact? I took it that the whole point of this initiating the contact is that it is something different from and something that occurs before the signals are sent down from the server to the playback device by saying, here's what you must now do. It's a predicate, too. You cannot transmit... So the fact that there are 18 embodiments showing the sending of control signals, it sounds to me like it's actually quite irrelevant to the question of initiating the contact, as to which there are zero descriptions, one way or the other. Well, I would disagree insofar as, since you cannot transmit a signal unless you have initiated a handshake or an electronic recognition of some kind, which is then confirmed, then necessarily the initiation of the contact always goes either together with or immediately before the control signal. It is then, if the control signal is fouled up or it is an error, it is ignored by the playback devices. If it is correct, it is recognized, the handshake is established, and the control signal is transmitted over to the playback device. Other instances? I thought I understood everything up to your last statement here. So are you saying that there is a two-way communication that's necessary? No, there isn't. Well, if the listening device does not receive a correct control signal, then you said it notifies back to the server? It ignores. It ignores. If it receives an incorrect or an erroneous signal, it ignores it. It just doesn't work. Correct. It sits there and waits. At no time ever does it go back over and try to find it. And this is consistent through there. And this is also consistent with the stated object of the invention, right? It's to preserve bandwidth, right? It's to preserve airway. And this was 1996 technology. This is radio paging technology. It doesn't further that object of the invention to facilitate two-way control. And the server is specifically configured and programmed to conserve airtime. Therefore, it's always going to be more efficient to have the programming computer be the one that delivers the control signal. And in order to do that, you have to have an issue. Maybe it's me, but I felt my understanding was that the control signal is different from a signal initiating contact. There's one signal initiating contact, same bandwidth, whether it goes this way or this way. I think in point of fact, in radio paging technology, this is much like the personal pagers that were around in the 1990s. You would call somebody and you would try to get a hold of them and then you would put in a number. And I believe that the initiation would probably be the lead portion of the signal package that delivered the control signal. With respect to personal pagers, it told you what number to call back. In this instance, it simply told the playback device what track to play. It's that simple. Does a pen disclose anything other than a broadcast to all the control signals to the listening devices? It discloses different ways for the computer to communicate with the server, but I believe radio paging is the only way or overwhelmingly dominant way that it could be communicated over to the playback device. Okay, you've got nine seconds. Do you want to wrap up? I thank you, Your Honors, for your time and engagement this morning. Thank you. Your Honors, the word that's being defined here is transmit, and they're reading in a step that happens before transmission. The case law is clear that there has to be a clear intention to depart from the ordinary meaning. There's not even a discussion of which device is initiating a contact in the spec. It's not discussed. It's not important. It doesn't matter if the receiving device requests the data or the sending device requests transmission. The fact is, as long as the transmission occurs, that's all that's important. Initiating a contact, those words or anything close to that is not even used in the patent. There's no support for reading that into the definition. One thing that AMT counsel said that was wrong in his argument was that he said that the definition of when a caller is placed on hold doesn't require the message to start from the beginning. If you read the court's opinion, it exactly says that. You would agree with him if what he meant by doesn't require is that the patent doesn't require that you would be dancing in the streets. That's, in fact, your position. But what he's arguing is that the definition, the definition by the district court requires that the message playback starts from the beginning of the song when the caller is placed on hold. Again, there's no embodiment that works that way. Judge, your questions are exactly right. There's no upstream link from the message playback device and the telephone system. If you look at the claims, the claims even say that the control signals are coming from the remote server located miles away. There is an upstream possible link from the playback device to the server but not from the phone system to the playback device. Yes, Your Honor. So the playback device has no idea whether there are zero or 17,000 people listening on hold. It has no idea. So there's no way that their definition can be right because a message playback can occur by the control signal saying, for example, play the message playback from 8 o'clock till 10 o'clock when the store is open. Somebody might not even call in and be put on hold and the message playback is happening the whole time. When somebody does get put on hold, the system has no idea when that happens because there's no communication going from the telephone system to the message playback system. Again, the definition of the district court as set forth by AMTC excludes every single embodiment and it can't be the right definition. Thank you, Your Honor. Thank you.